IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT JACKSON

DECEMBER 1998 SESSION



FILED

April 23, 1999

Cecil Crowson, Jr.

Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | * | C.C.A. # 02C01-9807-CC-00210 |
| Appellee, | * | DYER COUNTY |
| VS. | * | Hon. R. Lee Moore, Jr., Judge |
| TIMOTHY WALTON, | * | (Certified Question of Law) |
| Appellant. | * | |

For Appellant:

Charles S. Kelly, Attorney
Kelly, Millar, Strawn & Kelly
P.O. Box 507
802 Troy Avenue
Dyersburg, TN 38025-0507

For Appellee:

John Knox Walkup
Attorney General and Reporter

Peter M. Coughlan
Assistant Attorney General
425 Fifth Avenue North
Cordell Hull Building, Second Floor
Nashville, TN 37243-0493

C. Phillip Bivens
District Attorney General
P.O. Box E
Dyersburg, TN 38025-0220

OPINION FILED:_____

REVERSED AND DISMISSED

GARY R. WADE, PRESIDING JUDGE

<u>OPINION</u>

The defendant, Timothy Walton, was indicted for burglary, aggravated burglary, and two counts of theft over $500.00. When the trial court overruled the motion to suppress evidence, the defendant entered pleas of guilt to burglary and aggravated burglary and, with the approval of the state, reserved a certified question of law under Rule 37(b)(2)(i) of the Tennessee Rules of Criminal Procedure.

In this appeal, the issue presented for review is whether the trial court erred by failing to exclude evidence obtained from incriminating statements made by the defendant after his arrest. Because the officers making the arrest failed to provide <u>Miranda</u> warnings despite extended opportunities to do so, the defendant's statements should have been excluded. We must, therefore, reverse the judgment of the trial court and dismiss the charges against the defendant.

The defendant complains that he was "surprised at his home by the arrival of <u>five</u> law enforcement officers (one ... went to the rear of his property and, without a warrant, allegedly found some propane heaters...), questioned on his porch and in the yard, handcuffed and placed in the backseat of a patrol car and, in spite of the officers' testimony to the contrary, intimidated, urged, coaxed, coerced, questioned, and interrogated into revealing the location of other stolen property, which he retrieved and turned over to the officers [without ever] having been advised of his rights under <u>Miranda</u>...." The defendant insists that the statements he made as a result of the custodial interrogation should have been suppressed. He argues that it is "inconceivable that the officers ... did not ask any questions whatsoever" and that his incriminating statements were neither voluntarily nor spontaneously made.

2

At the suppression hearing, it was established that on May 22, 1997, Officers Jeff Burns, Terry McCreight, and Calvin Johnson of the Dyer County Sheriff's Department, while in the company of two federal postal inspectors, Chuck Demont and Henry Cooper, traveled in separate vehicles to the mobile home residence of the defendant to investigate his possible involvement in post office burglaries. As the other officers went to the front door, Officer Burns walked into the backyard to secure the rear of the residence. While there, he discovered a pathway which eventually led to ten or fifteen marijuana plants. He also discovered several propane heaters near the residence. No charges were placed against the defendant in regard to either the marijuana plants or the propane heaters.

Upon confronting the defendant, one of the postal inspectors advised that he was investigating a burglary within the post office and asked the defendant to accompany him to the sheriff's department for further questioning. Officer McCreight, who was aware that the defendant could neither read nor write and was of low intelligence, testified that the defendant was not under arrest and consented to being transported to the sheriff's department. The officers handcuffed the defendant and placed him in the backseat of an unmarked vehicle. Officer Johnson, an investigator for the sheriff's department, accompanied the defendant and Officer McCreight. The other officers traveled in different cars. Before entering the police vehicle, the defendant told Officer Johnson that a man named Charles Thompson had been "telling lies" and was out to "get him." According to Officer Johnson, the defendant claimed that he knew that Thompson had stolen and hidden several items and volunteered to tell the officer where to find the property.

Officers McCreight and Johnson testified that they did not ask the defendant any questions after he was handcuffed and placed into their vehicle. The

3

officers explained that they did not administer <u>Miranda</u> warnings because they did not consider him to be under arrest or otherwise in their custody. They contended that the defendant, without any encouragement on their part, led the officers to several areas where the officers were able to recover a computer, monitor and keyboard, and a rifle. According to the officers, the defendant provided directions to a point along a public road where a piece of plastic had been tied to a barbed wire fence. The officers then allowed the defendant, who was still in handcuffs, to walk into a ravine and take possession of the monitor, the keyboard, and computer, all of which had been wrapped in a plastic garbage bag. From there, the officers were directed to the home of the defendant's father and mother where a rifle, wrapped in a pair of coveralls, had been hidden in a nearby barn. The officers determined that a rifle matched the description of one that had been stolen from the residence of Gene Bryson, except that it had no scope. The defendant told officers that he had the scope at his residence. After returning to the defendant's residence, the officers discovered not only the scope but also an electric heater and stepladder which had been stolen during a burglary at the Dyersburg warehouse. The defendant was employed at the warehouse.

At the conclusion of the suppression hearing, the trial court ruled, in pertinent part, as follows:

> The defendant was handcuffed before being transported. He remained in handcuffs throughout the process of retrieving stolen property from two different locations and then returning back to his house where he retrieved further stolen property and then back to the sheriff's department. Viewing this matter under the totality of the circumstances, the court finds that <u>a reasonable person in the suspect's position would have considered himself deprived of freedom of movement to a degree associated with a formal arrest</u>.... [Any] <u>interrogation from the time the defendant was handcuffed and placed in the officer's vehicle would be a custodial interrogation</u>. The court finds, however, that under the proof elicited at the suppression hearing that there is no evidence that there

4

was any interrogation of the defendant after he was handcuffed. The only testimony available to the court for consideration is the testimony of the three officers mentioned above.... Officer McCreight and Investigator Johnson testified that there was no interrogation and that all of the information given by the defendant was spontaneous and voluntary and not elicited as a result of any interrogation or suggestion by either officer. Consequently, although the ... defendant was in custody at the time the information was obtained, ... the information was given voluntarily by the defendant and not in response to interrogation by either officer. The need for formal Miranda warnings presumes that the statements are elicited through interrogation or questioning.

(Emphasis added).

The state concedes that no waivers were obtained before the defendant provided this information and that the defendant had not been advised of his rights under Miranda v. Arizona, 384 U.S. 436 (1966). The state argues, however, that the stolen goods were recovered "as a result of the defendant's own unsolicited statements" rather than through the police interrogation.

The Fifth Amendment to the United States Constitution provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself...." Article I, § 9 of the Tennessee Constitution provides that "in all criminal prosecutions, the accused ... shall not be compelled to give evidence against himself." See Malloy v. Hogan, 378 U.S. 1 (1964). Generally, one must affirmatively invoke these protections. An exception is when a government agent makes a custodial interrogation. Statements made during the course of custodial police interrogation are inadmissible unless the state establishes that the defendant was advised of his constitutional rights as identified in Miranda and then waived those rights. Miranda requires that police inform the defendant as follows: (1) he has the right to remain silent; (2) any statement may be used against him; (3) he has

5

the right to the presence of an attorney; and (4) if he cannot hire an attorney, one will be appointed prior to the interrogation, if he so desires. Miranda, 384 U.S. at 444.

This court must examine the "totality of the circumstances" to ascertain whether the particular defendant knowingly and voluntarily waived his constitutional rights prior to making self-incriminating statements. State v. Bush, 942 S.W.2d 489, 500 (Tenn. 1997). Factors relevant in determining whether the statements are voluntary include (1) the length of time between the arrest and the confession; (2) the occurrence of intervening events between the arrest and confession; (3) the giving of Miranda warnings; and (4) the purpose and flagrancy of the official misconduct. Brown v. Illinois, 422 U.S. 590, 603-04 (1975); State v. Chandler, 547 S.W.2d 918, 920 (Tenn. 1977). The overriding question, however, is whether the behavior of law enforcement officials served to overbear the defendant's will to resist. State v. Kelly, 603 S.W.2d 726, 728 (Tenn. 1980); see State v. Howard, 617 S.W.2d 656, 658-59 (Tenn. Crim. App. 1981).

Our scope of review is limited. The findings of fact made by the trial judge at a hearing on a motion to suppress "will be upheld unless the evidence preponderates otherwise." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Questions about witness credibility and "resolution of conflicts in the evidence are matters entrusted to the trial judge." Id. If the "greater weight" of the evidence supports the court's ruling, it will be upheld. Id.

Custodial interrogation has three components: (1) that the defendant be in custody; (2) that interrogation occur; and (3) that the interrogation be conducted by a state agent. State v. Smith, 933 S.W.2d 450, 453 (Tenn. 1996).

6

Initially, the trial court correctly determined that the defendant was in custody. The evidence supports the conclusion that there was a sufficient restraint upon the freedom of movement of the defendant to qualify as an arrest. The trial court included in its findings of fact that officers believed that the defendant "might have some marijuana plants there and might know something regarding the postal burglaries." That marijuana had been found near his residence was communicated to the defendant by the officers. All of this supports the trial court's conclusion that the defendant was in custody.

Whether the defendant may have been the focus of the officer's investigation is not relevant to the question. The "test is whether ... a reasonable person in the suspect's position would consider himself ... deprived of freedom of movement to a degree associated with a formal arrest." State v. Anderson, 937 S.W.2d 851, 855 (Tenn. 1996); see Stansberry v. California, 511 U.S. 318 (1994) (by adopting the reasonable person objective test to determine whether a defendant was in custody, the Supreme Court abolished the "focus" factor in determining that the officer's undisclosed, subjective view was irrelevant). In Anderson, our supreme court ruled as follows:

> Some factors relevant to that objective assessment
> include the time and location of the interrogation; the
> duration and character of the questioning; the officer's
> tone of voice and general demeanor; the suspect's
> method of transportation to the place of questioning; the
> number of police officers present; any limitation on
> movement or other form of restraint imposed on the
> suspect during the interrogation; any interactions
> between the officer and the suspect, including the words
> spoken by the officer to the suspect, and the suspect's
> verbal or non-verbal responses; the extent to which the
> suspect is confronted with the law enforcement officer's
> suspicions of guilt or evidence of guilt; and finally, the
> extent to which the suspect is made aware that he or she
> is free to refrain from answering questions or to end the
> interview at will.

7

937 S.W.2d at 855.  Anderson established a totality of the circumstances test.  The factors listed are not intended to be exclusive and must be applied on a case-by-case basis.  See State v. Cooper, 912 S.W.2d 756 (Tenn. Crim. App. 1995).

In our view, evidence in the record preponderates against the trial court's finding that there was no interrogation after the defendant was handcuffed and placed under arrest.  There are several reasons for our reaching a different conclusion from that reached by the trial judge.  Initially, the officer's intent was to investigate one or more burglaries.  Acting on a tip provided by an informant, five officers were involved in the investigation.  Four confronted the defendant at the front door of his residence while a fifth secured the rear of the residence.  The officers involved, who expressed their intention to question the defendant about the crimes, found several marijuana plants and propane tanks which they believed had been stolen.  The defendant was confronted by officers with this additional information, handcuffed, and placed inside a vehicle driven by Officer McCreight.  Afterward, the defendant led two of the officers to three different locations and provided them with evidence which indicated that he had participated in several crimes.  While blaming a Charles Thompson for the misconduct and perhaps hoping for lenient treatment, the defendant provided the officers all they needed for these convictions.

Although the officers generally asserted that the defendant spontaneously volunteered the information, Officer Johnson did acknowledge asking the defendant to show him where the stolen goods were.  For example, when the rifle was recovered, Officer Johnson recalled that the officers asked the defendant if "there was anything else to go to this...."  Any such inquiry would qualify as an

8

interrogation.  So would a request for driving directions to a place where stolen property was hidden.

Despite several obvious opportunities to do so, the officers never administered the required Miranda warnings, a widely-recognized prerequisite for a custodial interrogation.  Officer McCreight drove the vehicle throughout the course of the search for stolen goods.  Officers acknowledged that the defendant was illiterate and of limited intelligence.  There was testimony at the suppression hearing by Officer Burns that Charles Thompson or Billy McNeely, co-defendants in this case, had provided information that had led to the investigation of the defendant.  Before their arrival at the scene, officers were aware that the defendant "had some of the goods" and "disposed of some of it."  Officer Burns conceded that he had the opportunity to obtain a search warrant but explained that the real purpose of the visit was for the federal officers "to question him about another incident."  After the lengthy search for the goods, the officers questioned the defendant at the jail.  Even then, the defendant had not been provided with the Miranda warnings.

Furthermore, the officers took a total of three vehicles to the defendant's premises.  They indicated a subjective view that the defendant was not under arrest even after he was handcuffed and placed inside the officer's vehicle.  While Officer McCreight denied questioning the defendant, he acknowledged that the defendant "told us where we needed to go."  The defendant walked only about thirty feet from the police vehicle into the ravine and was still handcuffed when he recovered the garbage bag with the stolen items.  He remained in handcuffs when taken to his parents' residence.  Upon their eventual return to the police station, Officer McCreight checked with other agencies to determine whether the returned

9

items had been stolen.  One exchange between the defense attorney and Officer McCreight during the suppression hearing was as follows:

> Q. You went from fetching ... the computer goods to his parents' home to an outbuilding where he graciously dug out a rifle for you.  Still handcuffed at this time?
>
> A. Yes, sir.
>
> Q. Still free to go though.
>
> A. Yes, sir.
>
> Q. Still not under arrest.
>
> A. After retrieving goods from the ravine and the defendant's parents' residence, they returned to the defendant's residence where he led them to a rifle scope, an electric heater, and a stepladder.

Even then, Officer McCreight described the defendant as "not under arrest and still free to go."  The officer testified that had the defendant demanded the removal of the handcuffs or his outright release, he would have done so.  Officers arrived at the defendant's residence in mid-morning and, although not discernible from the record, obviously took a considerable amount of time to complete their travels.

The greater weight of the evidence does not support the conclusions made by the trial court that the statements were admissible because they were spontaneously made.  In our view, the officers' subjective view that the defendant was not in custody lacked any plausible foundation.  Because the defendant was not "free to go," the officers had a duty to advise of the rights guaranteed in the Miranda decision.  Despite a lengthy opportunity to have done so, the officers chose to rely upon the defendant to give more and more incriminating information.  There was at least a limited amount of questions as to the whereabouts of the stolen goods and how to get there.  Moreover, the circumstances of the detention called for an explanation.  The purpose of the visit to the defendant's residence, the number of officers and police vehicles involved, the limitation on the defendant's movement,

10

the method of transportation, the duration and character of his detention as the stolen goods were being produced, and the extent to which the defendant was confronted with suspicions of guilt are circumstances which suggested not only an arrest but also a custodial expedition for incriminating evidence.

Although Tennessee appellate courts have not addressed the issue in depth, the United States Supreme Court has held that an interrogation is not limited to formal questioning but may include the functional equivalent of formal questioning. Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980). This is one of those situations. Interrogation "refers not only to express questioning, but also to any words or actions on the part of the police ... that the police should know are reasonably likely to elicit an incriminating response from the suspect." Id. at 301. The Supreme Court continued, "A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation." Id. See also Arizona v. Mauro, 481 U.S. 520 (1987).

> In Mauro, the high court commented as follows:
>
> In deciding whether particular police conduct is interrogation, we must remember the purpose behind our decision[] in Miranda ... : preventing government officials from using the coercive nature of confinement to extract confessions that would not be given in an unrestrained environment.

481 U.S. at 529-30. In our assessment, the "coercive nature" of the arrest produced the incriminating information. The greater weight of the evidence established that.

The trial court's analysis focused on the voluntary nature of the statements. While the statements may have been voluntary, there were not made by the defendant with the full knowledge of his rights. Had the officers taken the time to properly advise the defendant of his rights, the fruits of their interrogation would have been admissible as evidence. Because of their failure to do so and the

11

particular nature of their interrogation, the circumstances require suppression. Accordingly, the judgment is reversed, the evidence suppressed, and the charges dismissed.

_____
Gary R. Wade, Presiding Judge

CONCUR:


_____
Thomas T. Woodall, Judge


_____
John Everett Williams, Judge